## STATE v. NAT VILLIAM WRIGHT.

(Filed 14 June 1968.)

**1. Criminal Law § 75—**

*Miranda v. Arizona,* 384 U.S. 436, lays down the governing principle that, as a constitutional prerequisite to the admissibility of statements obtained from an accused during custodial police interrogation, the suspect must be advised in unequivocal terms (1) that he has a right to remain silent, (2) that anything he says can and will be used against him in court, (3) that he has a right to consult with a lawyer and to have a lawyer with him during interrogation, and (4) that, if indigent, a lawyer will be appointed to represent him.

**2. Same—**

Evidence of statements or admissions by defendant is rendered incompetent by circumstances indicating coercion or involuntary action.

**3. Criminal Law § 76;  Constitutional Law § 37—**

Mental capacity of the defendant, whether or not he is in custody, the presence or absence of mental coercion without physical torture or threats, are all circumstances to be considered in passing upon the admissibility of a pretrial confession and in passing upon the voluntariness of a waiver of constitutional rights.

**4. Constitutional Law § 32;  Criminal Law § 66—**

Confrontation for identification is a "critical stage" of pretrial proceedings requiring the presence of counsel unless waived.

**5. Constitutional Law § 33;  Criminal Law §§ 42, 58, 60, 66, 67—**

Handwriting samples, blood samples, fingerprints, clothing, hair, voice demonstrations, even the body itself, are identifying physical characteristics and are outside the protection of the Fifth Amendment privilege against self-incrimination.

**6. Constitutional Law §§ 32, 33—**

Requiring the accused to walk, to wear certain type clothing, to talk and repeat words allegedly uttered by the assailant at the time of the crime, nothing else appearing, are pretrial procedures which accused may be compelled to perform without violating his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments; yet, when performed by the accused for purposes of identification by the prosecutrix they then become part of a critical stage requiring the presence of counsel unless that right has been voluntarily, knowingly and intelligently waived.

**7. Criminal Law § 76—**

Where the court finds upon competent evidence that defendant had been fully advised of his constitutional rights and that his written waiver to "answer questions and make a statement" without a lawyer was made voluntarily, knowingly and intelligently, such findings are conclusive on appeal, and defendant's statement that he removed a screen, entered the prosecutrix' home through the window and touched but did not rape her is competent evidence and is properly admitted for the jury's consideration.

STATE *v.* WRIGHT.

**8. Constitutional Law § 37—**

Waiver of constitutional rights may be made orally and without advice of counsel.

**9. Constitutional Law §§ 32, 33; Criminal Law § 66— Confrontation of defendant and his victim for identification required presence of counsel.**

Defendant's statement, upon being advised of his right to counsel during a police identification line-up, that he "would not sign anything" but that he did not mind being in the line-up, is a sufficient waiver of the right to counsel, and the prosecutrix' failure to identify defendant as her assailant in the line-up with nine other prisoners exhausted the procedure to which defendant had orally consented; when defendant was taken from the line-up, made to put on clothes allegedly worn by the assailant, and was then exhibited singly to the prosecutrix for identification while being required to walk in her presence and to repeat the words allegedly spoken by her assailant at the time the crime was committed, the proceedings lost its character as a pretrial investigative procedure and became a critical stage requiring the presence of counsel, and evidence that the prosecutrix identified defendant at this confrontation is incompetent in the absence of evidence that defendant freely and understandingly waived the right to counsel.

**10. Criminal Law §§ 66, 84—**

Where prosecutrix' out-of-court identification of the defendant was made during a "critical stage" of the proceedings under circumstances whereby defendant was denied the right to counsel, her in-court identification of the defendant is incompetent unless it can be shown to have had an origin independent of the illegal confrontation.

APPEAL by defendant from *Hall, J.,* at the January 1968 Regular Criminal Session, DURHAM Superior Court.

Criminal prosecution upon a Bill of Indictment charging defendant with the crime of rape upon Mrs. Naomi Marie Byrd. The jury returned a verdict of guilty as charged with a recommendation of life imprisonment. From judgment in accordance therewith defendant appeals.

The State's evidence tends to show that Mrs. Naomi Marie Byrd lives at 1112 Taylor Street in Durham with her husband and two and one-half year old child. On the night of July 22, 1967, Mrs. Byrd retired about 11:15 p.m. The child was already asleep in a separate bed located in her bedroom. Mr. Byrd was asleep on a couch in the living room where they had watched a television movie.

Mrs. Byrd suddenly awakened around 12:15 a.m. and saw a man standing beside her bed. At first she thought it was her husband, but the man seemed larger and heavier than her husband and was wearing a cap with a little bill on it similar to a baseball cap. When she realized it was not her husband and started to raise up on her bed the man stuck a sharp object to the side of her neck and said, "Hush, hush, if you make a fuss I will kill you." He thereupon got on the

bed and repeated the quoted statement several times and also the words "open up." He had sexual intercourse with Mrs. Byrd by force and against her will while keeping the sharp object pressed against her neck. Mrs. Byrd feared for her life and was fearful that her husband might awaken and be killed or that her baby might be injured. The bedroom was rather light due to the fact that there is a street light to the rear of the house and the light was on in the living room straight down the hall from the bedroom. She could tell that her assailant was "definitely colored" and that he had on dark pants and a light shirt. She could not see his face because he kept it turned away. She could hear the way he talked because there was no whisper about it.

After the act was completed the intruder did not move for a few moments, and she said, "My husband is going fishing early." Her assailant said "okey" and got up and walked out of the bedroom and disappeared from view. She observed his walk for about eighteen to twenty feet. Prior to that time she had never seen nor known the defendant Nat Villiam Wright. Officers were called; they found that screens had been removed from the den and bathroom windows and placed on the ground to the rear of the house.

At 1:30 a.m. on July 23, Mrs. Byrd was examined by Doctor T. F. Adkins, a specialist in obstetrics and gynecology. She had gone to the hospital complaining of having been raped. The examination revealed the presence of male sperm. Her pelvic region was normal. No marks, abrasions or contusions were found on her neck, and no bruises were found about her body.

At 1:50 a.m. on Sunday morning, August 20, 1967, the defendant Nat Villiam Wright was arrested on a Peeping Tom charge, advised of his rights and lodged in jail. At 10:00 a.m. that same day, Detectives King and Upchurch of the Durham Police Department took defendant to the detective bureau, again warned him of his rights, and defendant in writing waived his right to counsel and agreed to answer questions and make a statement.

Thereupon, the detectives talked with him for awhile, advised him of their desire to put him in a line-up to be observed, and advised him that he had a right to have a lawyer during the time of the line-up. He refused to sign a written consent to be placed in a line-up, but said he did not mind being in the line-up and stated that he did not wish a lawyer present, that he did not need one. With his oral consent he was placed in a line-up of ten prisoners in a hall about twenty-five feet long and fourteen feet wide. Mrs. Byrd said she could not identify her assailant but would be able to identify him if she could hear him talk and see him walk. The line-up was then

discharged and defendant was immediately taken to a little room. At that time he had on dark pants and a light shirt, and the officer asked him to put on his cap. Then, in the presence of two officers and Mrs. Byrd, defendant was asked to repeat "hush, hush, if you make a fuss I will kill you. Open up." Officer Upchurch would say the words and then defendant would go along repeating them. He repeated them one time and then changed his voice and repeated them again. The officer asked him to speak in his normal voice the way he had been talking to them during the day, and he did. Then the officers requested him to walk back and forth so Mrs. Byrd could observe his walk, and he did. No other person or suspect was exposed to her. After seeing his walk and hearing him talk, Mrs. Byrd stated that defendant was the person who entered her bedroom and raped her.

After this episode, defendant was placed in a police car and driven to Taylor Street. The car was stopped on Taylor Street so its occupants could sit in the car and see between the houses. Defendant said he had seen Mrs. Byrd's house before. He lived about four blocks from it and would necessarily cross Taylor Street to go to the stores on Liberty Street. Officer Upchurch asked defendant if he didn't take the window out of that house and he said yes. At that time defendant told the officers that he took the screen off and entered the house through a window but said he did not rape this woman, that he put his hands on her and left. He said it was the window on the upper side of the house and that he left the house the same way he entered it.

The following day, August 21, 1967, an attorney was appointed for the defendant, and no statement was thereafter made to anyone.

On a *voir dire* examination in the absence of the jury the trial court found that defendant had been fully warned of his constitutional rights; that no threats of any nature were made against the defendant and no promises made to him; that defendant freely, voluntarily and understandingly made his statements to Detective Upchurch in the presence of Officer King and freely, voluntarily and understandingly uttered the words which the officers asked him to utter in the presence of Mrs. Byrd. The court therefore concluded that the statements made and the words uttered were made freely, voluntarily and understandingly by the defendant, and evidence thereof was admitted over defendant's objections.

Evidence for the defendant: Defendant testified that during July and August 1967 he lived at 419 Dale Street in Durham; that he has been married six years and has two children, ages four and five; that he has held four or five jobs since moving to Durham from

South Carolina, the longest being at the Buick place for about a year or more; that he cannot read or write although he went to the fourth grade at Chavis Highway School in Himmingway, South Carolina; that he quit school when thirteen years of age. He took oral tests for a driver's license.

He further stated that on August 20, 1967 he worked around his home cleaning and painting until 11:00 p.m. when he left to go to a store across Liberty Street to get some shoe strings. He had frequently gone to this little store and passed Taylor Street going and coming. He had frequently seen the outside of Mrs. Byrd's house at 1112 Taylor Street but had never been inside it. He had completed his mission and was on his way home about midnight to 12:30 a.m. when arrested and told he was being charged with Peeping Tom. He was placed in jail and first learned that he was charged with rape at the preliminary hearing on the following Monday after a lawyer had been appointed to represent him. He had never been arrested before and had never been in a police station. He didn't know what happened. At the time of his arrest he was wearing a cap with a bill, State's Exhibit 6, the same cap he wore for the confrontation with Mrs. Byrd. He stated that he had purchased the cap at the Salvation Army only the day before his arrest.

Defendant further testified that he is unable to read and write and that the writing on State's Exhibit 7, which purports to bear his signature on a waiver of his constitutional rights, is not his handwriting; that he did not write anything. In regard to his signature he stated that sometimes he signs his name with an "X" and sometimes he scribbles it. When he scribbles his name, he cannot tell whether he has done the scribbling or not.

According to defendant's testimony, Officer Upchurch accused him of entering Mrs. Byrd's house on Taylor Street. He denied the accusation saying he did not tell the officers he broke into her house, did not tell the officers he prized the screen off the window, did not tell the officers he entered the house and put his hands on the woman but did not rape her.

Two ministers and a member of the church to which defendant belongs testified that the general character and reputation of the defendant in the community where he lives is good. These witnesses also testified that defendant's mental capacity is that of a nine or ten year old child and that defendant is retarded, easily led and persuaded.

Defendant's wife testified that they had been married six and one-half years and had two children, ages five and three; that defendant doesn't think straight and clearly — more like an eight or

nine year old child. In July 1967 he was employed at the Triangle Brick Yard. He has had many jobs during the five years they had lived in Durham because he wasn't intelligent enough to do the work they put him to doing on different jobs. In spite of his mentality, he worked regularly and was able to support his family. He attended Mount Calvary Holy Church every Sunday with his wife and did so on the 23rd of July 1967, attending both the Sunday morning and Sunday night services. On the nights of July 21, 22 and 23, he was home with his wife and children. On the night of August 19 and early morning of August 20 he was not home. On the evening of August 19 he had washed his car, cut the grass, eaten supper and started painting a chest of drawers until about 9:30 or 10:00 p.m. He then left and said he was going to get some shoe strings but did not mention which store. He had been taking pills for stomach ulcers and also headaches since 1964.

Defendant offered in evidence the report of Doctor Bruce Kyles, Assistant Superintendent of Cherry Hospital, Goldsboro, N. C., where defendant had been confined for a sixty-day observation period following his arrest and prior to his arraignment. Following the clinical summary, which is without significance, the diagnosis is "moderate mental deficiency, without psychosis, IQ 62." Dr. Kyles thereupon returned defendant to court as able to stand trial stating, "It is the carefully considered opinion of the medical staff of this hospital that Nat Williams [*sic*] Wright is able to plead to the bill of indictment against him. He knows right from wrong, is aware of the nature and probable consequences of the offense with which he stands charged and in our opinion is able to consult with counsel in the preparation of his defense."

*T. W. Bruton, Attorney General, by Bernard A. Harrell, Assistant Attorney General, for the State.*

*E. C. Harris, Jr. and C. Wallace Vickers, Attorneys for defendant appellant.*

HUSKINS, J. Defendant brings forward the following assignments, to wit: (1) The court erred in permitting the prosecuting witness to identify defendant as her assailant because such in-court identification was based upon the out-of-court confrontation at the police station following her abortive attempt to identify him in a line-up, no counsel being present to represent him; (2) the court erred in permitting Officers Upchurch and King to testify regarding defendant's inculpatory statements to them, no counsel being present to represent him; (3) the court erred in failing to nonsuit, and (4) the court erred in failing to charge on circumstantial evidence.

*Miranda v. Arizona,* 384 U.S. 436, 16 L. ed. 2d 694, 86 S. Ct. 1602, lays down the governing principle that as a constitutional prerequisite to the admissibility of statements obtained from an accused during custodial police interrogation, the suspect must be advised in unequivocal terms (1) that he has a right to remain silent; (2) that anything he says can and will be used against him in court; (3) that he has a right to consult with a lawyer and to have a lawyer with him during interrogation; and (4) that if he is an indigent a lawyer will be appointed to represent him. After having been so advised, a defendant may waive these constitutional rights provided the waiver is made voluntarily, knowingly, and intelligently.

"The test of admissibility is whether the statement by the defendant was in fact made voluntarily." *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1. See also *State v. Rogers,* 233 N.C. 390, 64 S.E. 2d 572; *State v. Gosnell,* 208 N.C. 401, 181 S.E. 323; *State v. Livingston,* 202 N.C. 809, 164 S.E. 337. The admission is rendered incompetent by circumstances indicating coercion or involuntary action. *State v. Guffey,* 261 N.C. 322, 134 S.E. 2d 619. The "totality of circumstances" under which the statement is made should be considered. *State v. Chamberlain,* 263 N.C. 406, 139 S.E. 2d 620. Mental capacity of the defendant, *State v. Whittemore,* 255 N.C. 583, 122 S.E. 2d 396, whether he is in custody, *State v. Guffey, supra,* the presence or absence of mental coercion without physical torture or threats, *State v. Chamberlain, supra,* are all circumstances to be considered in passing upon the admissibility of a pretrial confession and in passing upon the voluntariness of a waiver of constitutional rights.

Confrontation for identification is a "critical stage" of pretrial proceedings requiring the presence of counsel unless waived. *U. S. v. Wade,* 388 U.S. 218, 18 L. ed. 2d 1149, 87 S. Ct. 1926; *Gilbert v. California,* 388 U.S. 263, 18 L. ed. 2d 1178, 87 S. Ct. 1951. That being true, Mrs. Byrd's out-of-court identification of defendant at the police station on August 20 was violative of defendant's constitutional right to counsel at that stage, and evidence of it was incompetent at the trial, unless defendant had voluntarily, knowingly and intelligently waived his right to counsel. *U. S. v. Wade, supra; Gilbert v. California, supra.*

The authorities hold, however, that handwriting samples, blood samples, fingerprints, clothing, hair, voice demonstrations, even the body itself, are identifying physical characteristics and outside the protection of the Fifth Amendment privilege against self-incrimination. *Schmerber v. California,* 384 U.S. 757, 16 L. ed. 2d 908, 86 S. Ct. 1826; *Gilbert v. California, supra; U. S. v. Wade, supra; State v. Gaskill,* 256 N.C. 652, 124 S.E. 2d 873; Annotation: Accused's

STATE *v.* WRIGHT.

Right to Counsel under the Federal Constitution, 18 L. ed. 2d 1420. Such pretrial police investigating procedures are not of such a nature as to constitute "critical" stages at which the accused is entitled to the assistance of counsel guaranteed by the Sixth Amendment and made obligatory upon the states by the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 9 L. ed. 2d 799, 83 S. Ct. 792; *Escobedo v. Illinois*, 378 U.S. 478, 12 L. ed. 2d 977, 84 S. Ct. 1758; *Pointer v. Texas*, 380 U.S. 400, 13 L. ed. 2d 923, 85 S. Ct. 1065. Therefore, requiring the accused to walk, to wear certain type clothing, to talk and repeat words allegedly uttered by the assailant at the time of the crime, nothing else appearing, are pretrial procedures which defendant may be compelled to perform without violating his constitutional rights under the Fifth, Sixth and Fourteenth Amendments. Even so, when performed by the accused for purposes of identification by the prosecutrix they then become part of a "critical" stage requiring the presence of counsel unless that right has been voluntarily, knowingly, and intelligently waived. *Gilbert v. California, supra.* It thus becomes necessary to examine the facts and circumstances under which defendant allegedly waived his right to assistance of counsel at the confrontation with Mrs. Byrd for identification purposes and during in-custody interrogation by Officers Upchurch and King.

Defendant was observed by Policeman Carter looking into a window at 1012 Franklin Street, four blocks from 1112 Taylor Street, at 1:50 a.m. on August 20, 1967. He was arrested and warned of his rights as follows:

"You have the right to remain silent, anything you say can and will be used against you in a court of law; you have the right to talk to a lawyer and have him present with you while you are being questioned; if you cannot afford to hire a lawyer one will be appointed to represent you for any questions, if you wish one."

He was thereafter lodged in jail. He was wearing a baseball or fishing cap at the time. At 10:00 a.m. the same day, defendant was advised again orally and in writing as follows:

"Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. We have no way of giving you a lawyer, but one

will be appointed for you, if you wish, if and when you go to court. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer."

Thereupon, defendant signed this waiver:

"I have read the statement of my rights shown above. I understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer. I understand and know what I am doing. No promises or threats have been made to me and no pressure of any kind has been used against me."

Officer Upchurch with Officer King present then talked with defendant for awhile, took him into a little room apart from the main hall in the county jail and explained his rights about being in a line-up. "At that time Detective King wrote out on a piece of paper giving his consent for a line-up and asked him if he would sign it. At that time he told us that he would not sign it but did not mind being in a line-up. He told us that he would not sign it, would not sign anything in writing but gave us his oral consent to us putting him in a line-up." He was then placed in a line-up with nine other prisoners, and Mrs. Byrd viewed them. She stated she could not identify her assailant from the line-up but could do so if she could hear him talk and see him walk. Defendant was then taken from the line-up, made to put on his dark pants and a light shirt and asked to put on his cap. Then, in the presence of the two officers and Mrs. Byrd, defendant was required to repeat, "Hush, hush, if you make a fuss I will kill you. Open up", and required to walk back and forth so Mrs. Byrd could observe his walk. After thus seeing him walk and hearing him talk, Mrs. Byrd identified defendant as the person who entered her bedroom and raped her. Later in court at the trial of this case, Mrs. Byrd identified defendant in the presence of the jury after the trial court had determined the competency of such evidence on a *voir dire* examination in the jury's absence. The court's findings and determination in that respect are as follows:

"After the alleged date of the offenses for which the defendant was arrested on a peeping tom charge on or about the 20th of August, 1967; that while the defendant was in custody on said peeping tom charge he was questioned by Police Detective Upchurch and other officers about the charges for which he is now being tried; that prior to any questioning by said officers the defendant was fully warned of his constitutional rights to

remain silent, that anything he said might be used against him in court; that he had a right to have a lawyer during the interrogation and that he had a right to have a lawyer appointed if he could not afford one; that the defendant stated that he did not desire counsel; that after his rights had been fully explained to him he freely and voluntarily signed a waiver; that there were no threats or promises whatever made by the said officers against the defendant; that in addition to the statements made to the officers by the defendant the officers asked the defendant to utter certain words in the presence of the prosecuting witness, Mrs. Byrd, the words being, 'Hush, hush, if you make a fuss I will kill you; open up open up,' or words to that effect. That prior to making these utterances no threats of any nature were made against the defendant and no promises made; that the defendant freely, voluntarily and understandingly made statements to Detective Upchurch and in the presence of Officer King, and freely, voluntarily, and understandingly uttered the above quoted words which the officers asked him to utter. The Court therefore concludes that the statements including the words uttered were made freely, voluntarily and understandingly by the defendant, and that the same are competent evidence."

Defendant's first assignment challenges the proceedings thus had and the competency of the evidence thus obtained.

In *State v. Gray, supra* (268 N.C. 69, 150 S.E. 2d 1), Lake, J., speaking for the Court, said:

"When the State proposes to offer in evidence the defendant's confession or admission, and the defendant objects, the proper procedure is for the trial judge to excuse the jury and, in its absence, hear the evidence, both that of the State and that of the defendant, upon the question of the voluntariness of the statement. In the light of such evidence and of his observation of the demeanor of the witnesses, the judge must resolve the question of whether the defendant, if he made the statement, made it voluntarily and with understanding. *State v. Barnes, supra* [264 N.C. 517, 142 S.E. 2d 344]; *State v. Outing, supra* [255 N.C. 468, 121 S.E. 2d 847, cert. den., 369 U.S. 807, 82 S. Ct. 652, 7 L. ed. 2d 555]; *State v. Rogers, supra* [233 N.C. 390, 64 S.E. 2d 572]. The trial judge should make findings of fact with reference to this question and incorporate those findings in the record. Such findings of fact, so made by the trial judge, are conclusive if they are supported by competent evidence in the record. No reviewing court may properly set aside or modify

those findings if so supported by competent evidence in the record." [Citations].

Such findings are conclusive in both state and federal courts if supported by competent evidence. *Watts v. Indiana,* 338 U.S. 49, 93 L. ed. 1801, 69 S. Ct. 1347; *Lyons v. Oklahoma,* 322 U.S. 596, 88 L. ed. 1481, 64 S. Ct. 1208; *Lisenba v. California,* 314 U.S. 219, 86 L. ed. 166, 62 S. Ct. 280.

Is there competent evidence in the record to support the finding by the trial judge that defendant freely, voluntarily and understandingly waived his right to counsel at the out-of-court confrontation for identification by the prosecutrix and at the in-custody interrogation by the officers?

Defendant's *written* waiver was to "answer questions and make a statement" without a lawyer. There is competent evidence to support the finding that defendant had been fully advised of his constitutional rights and that this waiver was made voluntarily, knowingly and intelligently. Hence, such findings by the trial judge are conclusive, and "no reviewing court may properly set aside or modify those findings. . . ." *State v. Gray, supra.* Therefore, the questions asked by the officers and the answers given by defendant relative to removal of the screen, entry of the Byrd home through the window, and touching the woman but not raping her, became competent evidence and were properly admitted for consideration by the jury.

On the other hand, defendant's *oral* waiver related to "being in a line-up". Defendant refused to sign a consent for a line-up written by Officer King, "said he would not sign anything", but stated he did not mind being in a line-up. Such waiver does not have to be in writing to be valid. *State v. McNeil,* 263 N.C. 260, 139 S.E. 2d 667. Nor is advice of counsel required in regard to making such waiver. *State v. Davis,* 267 N.C. 429, 148 S.E. 2d 250. He was placed in a line-up with nine other prisoners, and the prosecutrix was unable to identify him. This exhausted the procedure to which the defendant had orally consented. "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned. However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it . . ." *Stovall v. Denno,* 388 U.S. 293, 18 L. ed. 2d 1199, 87 S. Ct. 1967. When he was taken from the line-up, made to put on dark pants and a light shirt and his cap, and then exhibited to the prosecutrix for identification while required to repeat the words allegedly spoken by her assailant at the time the crime was committed and required to walk back and

forth so she could observe his walk, the proceeding lost its character as a pretrial investigative procedure and became a "critical" stage requiring the presence of counsel. Hence, findings by the trial judge that defendant freely, voluntarily and understandingly waived his right to counsel at this critical stage of the case are not supported by competent evidence. The out-of-court identification by Mrs. Byrd violated defendant's constitutional rights to the assistance of counsel under the Sixth and Fourteenth Amendments and rendered evidence of such out-of-court identification incompetent at the trial. Likewise, her in-court identification of defendant is incompetent unless it can be shown to have had an independent origin and did not result from the illegal, out-of-court confrontation. *Wong Sun v. U. S.*, 371 U.S. 471, 9 L. ed. 2d 441, 83 S. Ct. 407. In determining the admissibility of her courtroom identification of defendant, the test is whether, granting the primary illegality of her out-of-court identification, the in-court evidence "has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. U. S., supra.* More simply stated, if the in-court identification had an independent origin it is competent. If it resulted from the illegal, out-of-court confrontation it is incompetent because denial of counsel requires its exclusion. That question should be decided by the trial court on a *voir dire* examination at the next trial if the State again offers her in-court identification. *Wong Sun v. U. S., supra.*

For the reasons discussed, defendant's first assignment of error is sustained, and his second overruled. The remaining assignments may not arise again, and we refrain from a discussion of them at this time. It suffices to say that there was sufficient competent evidence to carry the case to the jury.

For the error pointed out defendant is entitled to a
New trial.